UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,

               Plaintiff,

v.

BENJAMIN MATTHEW LOGAN,

               Defendant.

Case No. 97-CR-0099(3) (PJS/RLE)

ORDER

---

Katharine T. Buzicky, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Lisa Lodin Peralta, PERALTA APPELLATE LAW PLLC, for defendant.

Defendant Benjamin Matthew Logan is serving a 540-month sentence after being convicted by a jury of robbery affecting interstate commerce, use and carrying of a firearm in relation to a crime of violence, unlicensed dealing in firearms, transportation and receipt of stolen firearms, and conspiracy.  This matter is before the Court on Logan's second motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i).  ECF No. 420.  For the reasons that follow, Logan's motion is denied.

## I.  BACKGROUND

In the early 1990s, Logan conspired with a number of others to obtain firearms, both legally and illegally; illegally transport those firearms from Minnesota to Chicago; and illegally sell those firearms to gang members and others.  Presentence Report

("PSR") ¶¶ 12–13.  In furtherance of the conspiracy, Logan and a coconspirator

(Zachary Roan) robbed Lloyd's Gun Shop in Minneapolis on June 23, 1992.  During the

robbery, two employees (Timothy Foslien and Brian Maas) were shot and killed.  Logan

and Roan stole 86 guns from the shop and then fled to Chicago, where they were

apprehended.  PSR ¶¶ 13–14.

Logan was convicted of the murders of Foslien and Maas in state court and

sentenced to two consecutive life terms.  PSR ¶ 16.  Later, however, his convictions were

overturned due to irregularities in the jury-selection process.  *State v. Logan*, 535 N.W.2d

320 (Minn. 1995).  At his retrial, Logan was acquitted of the murders.  PSR ¶ 16.

Later, a federal grand jury returned a 37-count indictment against Logan and

eight co-defendants.  PSR ¶¶ 1, 8.  Logan was charged in five of the 37 counts:  Count 1

charged Logan with conspiracy in relation to the unlicensed dealing of firearms, making

false statements in gun-transaction records, transporting stolen firearms across state

lines, and robbery affecting interstate commerce, all in violation of 18 U.S.C. § 371.

Count 2 charged Logan with robbery affecting interstate commerce, in violation of 18

U.S.C. § 1951.  Count 3 charged Logan with the use and carrying of firearms in relation

to a crime of violence, in violation of 18 U.S.C. § 924(c)(1).  Count 33 charged Logan

with unlicensed dealing in approximately 223 firearms, in violation of 18 U.S.C.

§§ 922(a)(1)(A) and 924(a)(1)(D).  And finally, Count 34 charged Logan with

transportation and receipt of approximately 97 stolen firearms, in violation of 18 U.S.C. §§ 922(j) and 924(a)(2).[1]  PSR ¶ 8.  The jury found Logan guilty of all five counts.  PSR ¶ 9.

On July 10, 1998, Logan was sentenced to 540 months in prison by Judge James M. Rosenbaum.  ECF No. 304.  Consistent with the PSR, Judge Rosenbaum calculated Logan's range under the United States Sentencing Guidelines as follows:  First, Count 3 (use and carrying of firearms in relation to a crime of violence) was excluded from the guidelines calculations, because the statute mandated a five-year consecutive term of imprisonment.  PSR ¶ 29 (citing U.S.S.G. § 3D1.1(b)).  Second, the remaining counts were "grouped together under § 3D1.2(b) because they involve[d] the same victim or societal harm and 2 or more acts connected by a common criminal objective."  PSR ¶ 33. The applicable guideline for the robbery conviction (Count 2, which was grouped with the relevant part of Count 1) was § 2B3.1; however, Judge Rosenbaum cross-referenced the murder guideline, § 2A1.1, because "the victim was killed under circumstances that would constitute murder."  PSR ¶ 32.  The applicable guideline for the firearms transactions (Counts 33 and 34, which were grouped with the relevant parts of Count 1) was § 2K2.1; once again, however, Judge Rosenbaum applied § 2A1.1 because "the

_____

[1]Under the original indictment, Logan was charged in Counts 1, 2, 3, 36, and 37. PSR ¶ 1.  Counts 36 and 37 correspond to Counts 33 and 34 of the redacted indictment, respectively.  References to the counts in this order refer to the redacted indictment.

defendant used and possessed a firearm in connection with the commission of another offense that resulted in death."  PSR ¶ 31 (citing § 2K2.1(c)(1)(B)).  Since the applicable guideline for both sets of counts was § 2A1.1, the base offense level for the grouped counts was 43.  PSR ¶ 34; *see also United States v. Logan*, No. 97-CR-0099(3)(JMR/RLE), 2008 WL 2622964, at *1–2 (D. Minn. July 2, 2008) (explaining the process that Judge Rosenbaum used to calculate Logan's guidelines range).

No adjustments or enhancements were applied, so the total offense level was 43,[2] and Logan's criminal-history category was I.  PSR ¶ 45.  The resulting guidelines range was life in prison, which exceeded the statutory maximum of 540 months.  PSR ¶ 68. Judge Rosenbaum sentenced Logan to the statutory maximum by imposing the following consecutive sentences:  60 months on Count 1, 240 months on Count 2, 60 months on Count 3, 60 months on Count 33, and 120 months on Count 34.  ECF No. 304.  Had Judge Rosenbaum not cross-referenced the murder guideline—that is, had Judge Rosenbaum not found that Logan's crimes were connected to a murder—Logan's guidelines range would have been much lower.  *See* ECF No. 426 at 5–6 (arguing that Logan's guidelines range would have been 151–188 months without the murder cross-reference, plus the mandatory 60 months for Count 3).

---

[2]Judge Rosenbaum declined to apply the two-level enhancement for obstruction of justice that was recommended in the PSR, despite finding that Logan perjured himself at trial.  PSR ¶ 38; *Logan*, 2008 WL 2622964, at *2 n.2.

Logan filed a direct appeal.  A panel of the Eighth Circuit reversed his convictions for armed robbery and use of a firearm in relation to a crime of violence, *United States v. Al-Muqsit*, 191 F.3d 928, 945 (8th Cir. 1999), but the en banc court later reinstated those convictions, *United States v. Logan*, 210 F.3d 820, 823 (8th Cir. 2000).  The Supreme Court denied Logan's petition for a writ of certiorari.  *Logan v. United States*, 531 U.S. 1053 (2000).

Logan has since filed numerous motions for post-conviction relief, including a 28 U.S.C. § 2255 motion, two requests for authorization to file a second or successive § 2255 motion, a motion for a sentence modification, two motions to appeal his sentence pursuant to 18 U.S.C. § 3742, and motions for reconsideration.  *See* ECF Nos. 373, 381, 388, 390, 391, 398, 404, 409.  None of these efforts have been successful.  *See* ECF Nos. 380, 385, 387, 397, 401, 402, 406, 411.

On April 20, 2020, Logan filed a pro se motion for compassionate release under § 3582(c)(1)(A)(i).  ECF No. 415.  This Court[3] denied Logan's motion for failure to exhaust administrative remedies, but also made clear that, even if Logan had exhausted, the Court would deny his request on the merits, as his request was essentially an unauthorized second or successive § 2255 motion.  ECF No. 418.  Logan then exhausted his administrative remedies, *see* ECF No. 420-1 at 1–2; ECF No. 430 at 7, and filed a

---

[3]After Judge Rosenbaum retired, this case was reassigned to the undersigned. ECF No. 417.

second pro se motion for compassionate release that differed in substantial respects from his first motion.[4]  ECF No. 420.  The Court appointed counsel for Logan and issued a briefing order.  ECF Nos. 422, 423, 425.

Through counsel, Logan argues that several circumstances, considered together, warrant his compassionate release:  First, Logan was sentenced when the United States Sentencing Guidelines were mandatory—that is, prior to *United States v. Booker*, 543 U.S. 220 (2005).  Second, in applying the cross-reference to the murder guideline, Judge Rosenbaum relied on a preponderance-of-the-evidence standard later rejected in *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  Third, Judge Rosenbaum applied the cross-reference to the murder guideline despite the fact that Logan had been acquitted of the murder charges in state court.  Fourth, recent murder and robbery sentences are, on average, much shorter than Logan's 540-month sentence.  Fifth, Logan was only 20 years old at the time of the offense, and he has now served over 27 years in prison.  And finally, Logan has submitted strong evidence of rehabilitation.

Over the past year, federal courts (including this Court) have been deluged by compassionate-release motions focused on the coronavirus pandemic.  Logan's motion is obviously quite different, and, as the pandemic ends, future compassionate-release

---

[4]Logan's pro se filing is titled "Motion for Reconsideration of Motion to Modify Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)."  ECF No. 420 at 1.  The parties agree, however, that Logan's motion is actually a second motion for compassionate release, so the Court treats it as such.  *See* ECF No. 430 at 6 n.2; ECF No. 431 at 2 n.1.

motions are likely to resemble Logan's.  The Court therefore takes this opportunity to

address how it intends to exercise its discretion in considering compassionate-release

requests such as Logan's.

## II.  ANALYSIS

### A.  Section 3582(c)(1)(A)(i) and U.S.S.G. § 1B1.13

Under § 3582(c)(1)(A)(i)—the compassionate-release statute—a court may

reduce a defendant's term of imprisonment if, "after considering the factors set forth in

section 3553(a) to the extent that they are applicable," the court finds that

"extraordinary and compelling reasons warrant such a reduction" and "that such a

reduction is consistent with applicable policy statements issued by the Sentencing

Commission."  The Sentencing Commission has issued U.S.S.G. § 1B1.13, a policy

statement that governs motions under § 3582(c)(1)(A).  At the time that § 1B1.13 was

issued, however, the Bureau of Prisons ("BOP") had the sole authority to bring motions

for release under § 3582(c)(1)(A).  Unfortunately, § 1B1.13 has not been updated to

reflect that, as a result of the First Step Act of 2018, defendants now have the ability to

bring compassionate-release motions.

The parties dispute whether § 1B1.13 applies to motions filed by defendants.

Several circuits have held that § 1B1.13 applies only to motions filed by the BOP, and

not to motions filed by defendants.  *See United States v. McCoy*, 981 F.3d 271, 280–84 (4th

Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108–11 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180–81 (7th Cir. 2020); *United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020).  The Eighth Circuit has not yet addressed this issue.[5]  In the absence of clarification from the Eighth Circuit, this Court has treated § 1B1.13 as providing useful guidance about how to exercise its discretion under § 3582(c)(1)(A), but not as binding. *See, e.g.*, *United States v. Robinson*, No. 19-CR-0143 (PJS/BRT), 2021 WL 528002, at *2 (D. Minn. Feb. 12, 2021).

The government invites the Court to reconsider its position and find that § 1B1.13 does in fact apply to motions filed by defendants and is in fact binding.[6]  The Court

---

[5]The Eighth Circuit has sidestepped the issue on multiple occasions.  *See United States v. Fine*, 982 F.3d 1117, 1118 (8th Cir. 2020) ("The law is unsettled in this circuit about what reasons a court may consider extraordinary and compelling under § 3582(c)(1)(A)(i), but we need not address the broader issue here." (internal citation omitted)); *United States v. Loggins*, 966 F.3d 891, 892 (8th Cir. 2020) ("We need not decide whether the statute supersedes the policy statement in this respect, because the district court's order shows that it considered the circumstances urged by Loggins and found them insufficient."); *United States v. Rodd*, 966 F.3d 740, 747 (8th Cir. 2020) ("We need not determine whether the district court erred in adhering to the policy statements in § 1B1.13.  The district court knew its discretion.").

[6]The government argues that the Supreme Court's decision in *Dillon v. United States*, 560 U.S. 817 (2010), requires the application of § 1B1.13 here.  The Court disagrees.  *Dillon* makes clear that, if and when the Commission issues a policy statement that addresses § 3582(c)(1)(A)(i) motions brought by defendants, "courts will be required to ensure that any sentence reductions granted on defendants' motions are consistent with that guidance."  *McCoy*, 981 F.3d at 284 (citing *Dillon*, 560 U.S. at 826–27).  But the Sentencing Commission has not yet issued such a policy statement. *See Jones*, 980 F.3d at 1106–08 (citing *Dillon*, but concluding there is no applicable policy
(continued...)

declines the government's invitation.  Section 3582(c)(1)(A) authorizes a court to reduce
a sentence when "such a reduction is consistent with applicable policy statements
issued by the Sentencing Commission."  But "the Commission has yet to issue a policy
statement that applies to motions filed by defendants under the recently amended
§ 3582(c)(1)(A)."  *McCoy*, 981 F.3d at 275.  By its terms, § 1B1.13 applies only "[u]pon
motion of the Director of the Bureau of Prisons."  *See also id.* cmt. n.4 (noting "[a]
reduction under this policy statement may be granted only upon motion by the
Director" of the BOP).  As a technical matter, then, there is no policy statement that is
"applicable" to compassionate-release motions filed by defendants.

### B.  *"Extraordinary and Compelling Reasons"*

Although the Court is not bound by § 1B1.13, the Court is of course bound by the
statute.  Section 3582(c)(1)(A)(i) requires a court to find "extraordinary and compelling
reasons" in order to reduce a defendant's sentence.  As several courts have recognized,
the extraordinary-and-compelling standard sets a very high bar and authorizes sentence
reductions only in "truly exceptional cases."  *McCoy*, 981 F.3d at 287–88 (noting further
that "§ 3582(c)(1)(A)(i) set[s] an exceptionally high standard for relief"); *see also Gunn*,
980 F.3d at 1180 ("[W]e do not see the absence of an applicable policy statement as
creating a sort of Wild West in court, with every district judge having an idiosyncratic

---

[6](...continued)
statement for release motions brought by prisoners).

-9-

release policy.  The statute itself sets the standard:  only 'extraordinary and compelling

reasons' justify the release of a prisoner who is outside the scope of § 3582(c)(1)(A)(ii).");

*United States v. Milbrandt*, No. 15-CR-0155 (DWF/JSM), 2021 WL 147130, at *3 (D. Minn.

Jan. 15, 2021) (noting there is a "high standard" for granting compassionate release).

Congress set a very high bar, but Congress invited the Sentencing Commission to

flesh out the meaning of "extraordinary and compelling."  Section § 1B1.13 was the

Commission's response to this invitation.  *See United States v. Williams*, No. 06-CR-0143

(WMW/FLN), 2020 WL 614807, at *1 (D. Minn. Feb. 10, 2020).  The First Step Act "did

not change the standard" for release.  *United States v. Ebbers*, 432 F. Supp. 3d 421, 427

(S.D.N.Y. 2020).  In other words, the extraordinary-and-compelling standard applies to

motions brought by defendants, just as it applies to motions brought by the BOP.  *See*

*United States v. Rivernider*, No. 3:10-cr-222(RNC), 2020 WL 597393, at *2 (D. Conn. Feb. 7,

2020) ("In eliminating the requirement of a BOP motion, Congress did not modify the

substantive standard governing eligibility for compassionate release."); *United States v.*

*Willis*, 382 F. Supp. 3d 1185, 1187 (D.N.M. 2019) ("Aside from allowing prisoners to

bring a motion directly, the First Step Act did not change the standards for

compassionate release.").

As the Court has already explained, § 1B1.13 does not apply to motions for

compassionate release filed by defendants.  But there is no reason in law or logic why

"extraordinary and compelling" would have one meaning when applied to motions brought by the BOP and a different meaning when applied to motions brought by prisoners. *See Ebbers*, 432 F. Supp. 3d at 427 ("[T]here is no indication in the text or the [Sentencing Commission's] policy statements that the identity of the movant should affect the meaning of the phrase 'extraordinary and compelling reasons.'"). And thus, this Court finds that § 1B1.13's definition of "extraordinary and compelling" should be afforded substantial deference when a court considers compassionate-release motions filed by defendants, as such deference is consistent with the intent (even if not mandated by the letter) of § 3582(c)(1)(A).

To summarize: Section 3582(c)(1)(A) empowers a court to reduce a sentence only for "extraordinary and compelling reasons" and only when "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." The policy statement found in § 1B1.13—although technically not "applicable" to motions filed by prisoners—nonetheless sets forth the Sentencing Commission's considered views regarding the meaning of "extraordinary and compelling." And there is no reason to believe that the meaning of "extraordinary and compelling" changes depending on the identity of the movant. *See McCoy*, 981 F.3d at 282 n.7 ("That does not leave Guideline § 1B1.13 without practical import. . . . [I]t remains helpful guidance even when motions are filed by defendants."); *Gunn*, 980 F.3d at 1180 (since § 1B1.13

provides a "working definition" of "extraordinary and compelling reasons," a court should be reluctant to "strike[] off on a different path").

### C.  Additional Considerations

Although the Court concludes that substantial deference is owed to § 1B1.13, the Court also recognizes that it is bound to consider any relevant evidence submitted by defendants.  This is true not just because § 1B1.13 is not binding, but because § 1B1.13 itself recognizes that a prisoner's release can be justified by "an extraordinary and compelling reason other than, or in combination with, the reasons" that are specifically identified in that policy statement.  § 1B1.13, cmt. n.1(D).

In exercising its broad discretion under § 3582(c)(1), this Court will distinguish between, on the one hand, facts and law that existed at the time of sentencing and that were (or could have been) taken into account by the sentencing judge and, on the other hand, facts and law that did not arise until after sentencing and thus could not have been taken into account by the sentencing judge.  The Court will refer to the former as "intrinsic" factors (because they could have been reflected in the sentencing judgment) and to the latter as "extrinsic" factors (because they could not have been reflected in the sentencing judgment).

### 1.  Intrinsic Factors

As noted, intrinsic factors are the legal and factual circumstances that existed at the time that the sentence was imposed—circumstances that the sentencing judge considered (or at least could have considered) when deciding on the defendant's sentence. A defendant who bases a § 3582(c)(1)(A)(i) motion on intrinsic factors is essentially asking for a "do-over" of his sentencing—that is, he is asking the judge before whom the § 3582(c)(1)(A)(i) motion is pending to re-weigh the law and facts that were before the sentencing judge at the time of sentencing. Admittedly, nothing in § 3582(c)(1)(A)(i) prohibits a court from considering intrinsic factors when deciding whether to reduce a prisoner's sentence, but this Court will generally give such factors little weight.

Congress initially enacted § 3582(c)(1) to give the BOP the authority to seek—and courts the authority to grant—compassionate release when such release was warranted by factual developments that occurred *after* sentencing. As one court explained, "[t]he compassionate release provisions were . . . intended to be a 'safety valve' to reduce a sentence in the 'unusual case in which the defendant's circumstances are so changed, such as by terminal illness, that it would be inequitable to continue the confinement of the prisoner.'" *Ebbers*, 432 F. Supp. 3d at 430  (citation omitted). Section § 3582(c)(1) was not enacted to provide courts with a mechanism to second-guess sentencing decisions made long ago.

-13-

Congress amended § 3582(c)(1) in 2018 to authorize defendants to bring their

own compassionate-release motions.  Congress acted because it had grown frustrated

with the BOP's reluctance to seek compassionate release for worthy prisoners.  *See*

*McCoy*, 981 F.3d at 276.  But Congress did not in any way change the purpose of the

statute, which again was to give courts a means to shorten sentences that had been

rendered unjust by *post*-sentencing developments.  There is no evidence that Congress

amended § 3582(c)(1) to give prisoners the opportunity to argue—again and again and

again—that they should have received a shorter sentence based on the law and facts

that existed at the time that they were sentenced.  (It is important to note that there is no

limit on the number of compassionate-release motions that a prisoner can file.)

Defendants enjoy a range of safeguards that are intended to prevent or correct

unjust sentences, including the right to a sentencing hearing (and the many rights that

defendants are afforded in connection with a sentencing hearing), the right to directly

appeal a sentence, and the right to challenge a sentence in a § 2255 proceeding.  To

allow a defendant to use a compassionate-release request as yet another avenue to

attack the legality or validity of a sentence would, as a practical matter, render nugatory

the carefully crafted rules that govern those safeguards, such as rules about preserving

issues for direct appeal, filing second or successive habeas petitions, and obtaining

certificates of appealability.[7]  Given the purpose of compassionate release—and given

its relationship to sentencing proceedings, direct appeals, and habeas proceedings—this

Court will rarely if ever grant compassionate relief based solely on intrinsic factors.[8]

---

[7]The Eighth Circuit has been clear that it is improper for defendants to use compassionate-release motions to contest the legality or validity of their sentences. *United States v. Fine*, 982 F.3d 1117, 1118 (8th Cir. 2020) (noting a defendant cannot use compassionate-release motion as mechanism to challenge the validity of his sentence); *see also United States v. Logan*, No. 97-CR-0099(3) (PJS/RLE), 2020 WL 2194023, at *1 (D. Minn. May 6, 2020) ("'§ 3582(c)(1)(A) provides a mechanism to seek a reduction in the term of a sentence, not to challenge its validity.'" (quoting *United States v. Handerhan*, 789 F. App'x 924, 926 (3d Cir. 2019))).

[8]*See McCoy*, 981 F.3d at 287 (noting § 3582(c)(1)(A)(i) applies "when there is *not* a specific statute that already affords relief but 'extraordinary and compelling reasons' nevertheless justify a reduction"); *United States v. Saleh*, No. 93cr181, 2020 WL 3839626, at *4 (S.D.N.Y. July 8, 2020) (rejecting argument that the defendant would be sentenced to a lower sentence today under advisory guidelines because he "is attempting to relitigate his case and dodge procedural requirements"); *United States v. Schaefer*, No. 7-cr-498 (LJL), 2020 WL 3957396, at *2 (S.D.N.Y. Apr. 29, 2020) ("Section 3582(c)(1)(A) does not permit the Court to modify a sentence based simply on disagreement with the sentence previously imposed . . . ."); *United States v. Lisi*, 440 F. Supp. 3d 246, 251 (S.D.N.Y. 2020) ("[I]t would be both improper and inconsistent with the First Step Act to allow [the defendant] to use 18 U.S.C. § 3582(c)(1)(A) as a vehicle for claiming legal wrongs, instead of following the normal methods of a direct appeal or a habeas petition."); *Rivernider*, 2020 WL 597393, at *4 ("To my knowledge, nobody has suggested that the 'extraordinary and compelling' standard can be satisfied by claims of legal error or other alleged wrongs that are cognizable on direct appeal from a conviction or by means of a habeas corpus petition."); *Ebbers*, 432 F. Supp. 3d at 429 (noting the § 3553(a) factors "do not provide additional justifications for reducing the defendant's sentence," because "[w]hat justifies compassionate release is a finding that new mitigating 'extraordinary and compelling' circumstances exist to reduce that sentence; it is not an opportunity to second guess or to reconsider whether the original sentence was just"); *United States v. Williams*, No. 4:15-CR-00037-1BR, 2019 WL 6529305, at *1 (E.D.N.C. Dec. 4, 2019) ("Motions for a sentence reduction under § 3582(c)(1)(A) are not

(continued...)

Revisiting old sentencing decisions is also bad policy, especially when the judge considering the § 3582(c)(1)(A)(i) motion is not the judge who originally sentenced the defendant.  Appellate courts give a great deal of deference to the sentencing decisions of trial judges for a reason:  Trial judges know far more about the defendant and about the case than can ever appear on a cold record.  *See United States v. Scott*, 732 F.3d 910, 917–19 (8th Cir. 2013) (discussing standard of review).  Here, for example, Judge Rosenbaum had presided over this case for 14 months—including a 12-day jury trial—by the time that he sentenced Logan.  When Judge Rosenbaum decided on Logan's sentence, Judge Rosenbaum knew far more about Logan, his co-defendants, his crimes, and his victims than the undersigned will ever learn—and far more than could ever be conveyed through briefs and a written record.  This Court will generally be loathe to use a § 3582(c)(1)(A) motion to substitute its judgment for the judgment of a sentencing judge.  Similarly, this Court will generally be loathe to use a § 3582(c)(1)(A) motion to revisit a sentencing decision that the Court itself made years ago, when the matter was fresh in its mind.

---

[8](...continued)
substitutes for direct appeal or habeas corpus motions.").

For these reasons, then, this Court is unlikely to grant a compassionate-release request that is based solely on intrinsic factors.[9]

## 2. Extrinsic Factors

Extrinsic factors are a different matter.  Extrinsic factors reflect changes in the law or the facts that occurred after sentencing and thus could not have been taken into account by the sentencing judge.  Basing a compassionate-release decision on extrinsic factors is therefore entirely consistent with the purpose of § 3582(c)(1)(A).  That said, this Court believes that some extrinsic factors are entitled to more weight than others.

### a.  Legal Changes

As a general matter, the Court is wary of finding that a change in the *law* that occurs after a defendant is sentenced—but that is not made retroactively applicable to the defendant—provides an extraordinary and compelling reason to grant the defendant's motion for compassionate release.

The law that applies to criminal sentences may change in various ways. Congress might enact a statute that increases or decreases the penalties for a particular crime.  The Sentencing Commission might amend the Sentencing Guidelines in a way that increases or decreases the sentencing range recommended by the guidelines for a

---

[9]To be absolutely clear, the Court recognizes that it has the *discretion* to grant compassionate release on the basis of intrinsic factors.  The Court is describing how it intends to *exercise* that discretion.

particular crime.  Or the Supreme Court might issue a decision that has the effect of increasing or decreasing the punishment for a particular crime.

There is a large and complex body of statutory and common law about the extent to which a defendant who has already been sentenced can take advantage of changes to the law that occur after he is sentenced.  Allowing a defendant to use a compassionate-release request to bypass that body of law is problematic.  If the Supreme Court, or Congress, or the Sentencing Commission has decided that a change in the law should *not* be applied retroactively to a particular class of defendants, then allowing a defendant within that class to use § 3582(c)(1)(A)(i) to take advantage of that change in the law would fail to respect the decision of the relevant institution and create unfair disparities among defendants.

Even putting that aside, this Court is not persuaded by Logan's argument that he should be released because, if he had committed his crime today, he likely would receive a shorter sentence.  (As described below, the Court also doubts the accuracy of Logan's premise.)  Congress regularly increases or decreases the penalties for particular crimes because those crimes are being committed more or less frequently, or because those crimes are causing more or less harm, or because society's views about those crimes have changed, or because the ideological makeup of Congress has changed. *Compare Booker*, 543 U.S. at 236 (noting legislatures enacted enhancements for drug

-18-

crimes due to a "growing and wholly justified legislative concern about the proliferation and variety of drug crimes"), *with United States v. Vigneau*, 473 F. Supp. 3d 31, 38 (D.R.I. 2020) (discussing societal change in views about marijuana and resulting legalization in several states).

Every crime is committed at a certain point in time. If the defendant commits a crime when society views it to be particularly serious—and accordingly provides particularly harsh punishments—then the fact that society changes its mind later does not provide an extraordinary and compelling reason to release a defendant. After all, such changes are common, and common is the opposite of extraordinary. Moreover, the defendant was not deterred from committing the crime *despite* the substantial social opprobrium and harsh penalties existing at the time; that does not speak well of either the defendant or his prospects for rehabilitation. *Cf. United States v. Mitchell*, No. 03-40021, 2021 WL 462123, at *5 (C.D. Ill. Feb. 9, 2021) ("The Defendant's sentence was not unjust, illegal, or disparate because any other similarly situated defendant would have faced the same penalty. While Defendant would not receive a life sentence if he was sentenced today, this argument cannot be shoehorned into a motion for compassionate release."); *United States v. Kissi*, 469 F. Supp. 3d 21, 38 (E.D.N.Y. 2020) ("[T]he changes to the safety valve provisions would likely not be sufficient, on their own, to constitute extraordinary and compelling circumstances under section 3582(c)."); *United States v.*

-19-

*Almontes*, No. 3:05-cr-58 (SRU), 2020 WL 1812713, at *9 (D. Conn. Apr. 9, 2020) (finding the fact that "the legal landscape has changed, allowing numerous of [the defendant's] co-conspirators to benefit from a reduction in sentence," but not the defendant, "certainly [did] not rise to the level of an 'extraordinary and compelling' reason to reduce his sentence" but was a "relevant consideration").

There may be exceptions.  Recently, for example, both Congress and the Sentencing Commission acted to reduce the disparity between the penalties for powder cocaine and the penalties for crack cocaine.  These actions did not reflect the normal ebb and flow of public opinion, but rather growing evidence that the disparity was attributable to racial animus.  *See United States v. Luna*, 436 F. Supp. 3d 478, 481 (D. Conn. 2020) (discussing legislative changes made to address the cocaine-crack disparity).  Fortunately, these changes were made retroactive.  But if a defendant who was disadvantaged by a racially biased sentencing scheme was unable to benefit from a retroactive change to that scheme because of an oversight—that is, because of unusual circumstances that were not foreseen by Congress or the Sentencing Commission—the Court could use § 3582(c)(1)(A)(i) to correct that injustice.

In the absence of such unusual circumstances, however, this Court has significant reservations about allowing a defendant to use § 3582(c)(1)(A)(i) to take

advantage of a change in the law that was not made retroactively applicable to that defendant.

### b. Factual Changes

Factual changes that occur after sentencing—the type of changes that Congress had in mind in enacting § 3582(c)(1)(A)—generally provide the strongest basis for a compassionate-release request. Application Note 1 of § 1B1.13 is instructive on this issue, as it outlines the types of factual circumstances that the Sentencing Commission regards as "extraordinary and compelling," including a serious medical condition "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," advanced age and its health impacts, and certain family circumstances. For example, a medical condition putting the defendant at great risk of serious illness from COVID-19 has been, and continues to be, an extraordinary and compelling reason warranting release. *See, e.g.*, *United States v. Pape*, No. 12-CR-0251 (PJS/LIB), 2020 WL 6042397 (D. Minn. Oct. 13, 2020) (granting release based on the defendant's serious health conditions putting him at risk from COVID-19).

Of course, not all post-sentencing factual developments will provide a strong basis for compassionate release. In particular, this Court is reluctant to give substantial weight to evidence regarding the defendant's rehabilitation, unless there is something exceptional about that rehabilitation. Granting compassionate release solely on

grounds of rehabilitation is explicitly foreclosed by statute.  *See* 28 U.S.C. § 994(t) ("Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.").  Notably, rehabilitation is the *only* circumstance that Congress has singled out as *not* being "extraordinary and compelling."  *See Williams*, 2020 WL 614807, at *1.  True, the statute says that rehabilitation "alone" is not extraordinary and compelling, which leaves room for a court to consider rehabilitation in conjunction with other factors.  But the fact that Congress singled out rehabilitation for disfavored treatment is significant.

Congress's decision is understandable.  Prisoners are *supposed* to follow the rules, take classes, work at a job, and otherwise attempt to improve themselves.  That a prisoner does so means that he has met baseline expectations, not that he has done something extraordinary.  *See Saleh*, 2020 WL 3839626, at *4 ("[E]very inmate should strive for a productive institutional record while incarcerated because that is what is expected.").  The Court recognizes that there could be truly extraordinary instances of rehabilitation, such as a defendant who risks his life to help his fellow inmates in a pandemic or to rescue a corrections officer who has come under attack.  But there is nothing "extraordinary and compelling" about a prisoner who simply does the things that prisoners are supposed to do.

-22-

In sum, in ruling on § 3582(c)(1)(A)(i) motions, this Court will usually give substantial deference to § 1B1.13 (even though it is technically not binding); little weight to intrinsic factors (that is, to the legal and factual circumstances that were before the sentencing judge at the time of sentencing); little weight to post-sentencing changes in the law that are not made retroactively applicable to the defendant; and little weight to evidence of ordinary rehabilitation. The Court recognizes that this approach will mean that few compassionate-release requests will be granted. That is exactly as it should be, however, as "§ 3582(c)(1)(A)(i) set[s] an exceptionally high standard for relief." *McCoy*, 981 F.3d at 288.

### D.  Logan's Motion

Having outlined a basic framework for examining compassionate-release motions, the Court now applies that framework to Logan's motion. As already mentioned, Logan argues that several circumstances combine to create an "extraordinary and compelling" reason justifying his release.

### 1.  Extrinsic Legal Factors: Post-Sentencing Legal Changes

Logan argues that the legal changes resulting from *Apprendi* and *Booker*—both of which were decided after he was sentenced—weigh in favor of his release for two reasons. First, Judge Rosenbaum applied the cross-reference to the murder guideline based on a finding that he made by applying the preponderance-of-the-evidence

-23-

standard—a process that was later held to be constitutionally deficient.  As a result,

Logan argues—incorrectly, it should be pointed out[10]—that his

---

[10]If Logan were sentenced today, he could receive the same guidelines range and sentence that he received in 1998.  Logan's argument to the contrary overlooks the fact that the guidelines are now advisory, and thus, as the Eighth Circuit has held, cross-referencing another guideline poses no *Apprendi* concern, so long as the defendant is ultimately sentenced to a term at or below the statutory maximum.  *See United States v. Jackson*, 782 F.3d 1006, 1012–14 (8th Cir. 2015); *United States v. Davis*, 753 F.3d 1361, 1361–62 (8th Cir. 2014) (per curiam).  The Eighth Circuit has even upheld judicial application of the cross-reference to the murder guideline based on a preponderance-of-the-evidence standard, explaining that post-*Booker*, "[a]pplication of the § 2A1.1 cross-reference neither increases the penalty beyond the statutory maximum, *see Apprendi*, 530 U.S. at 490, nor increases the mandatory minimum, *see Alleyne* [*v. United States*, 570 U.S. 99, 103 (2013).]"  *Davis*, 753 F.3d at 1361; *see also Jackson*, 782 F.3d at 1012–14.  The Eighth Circuit has also held that a court "may use a defendant's relevant conduct in sentencing if it finds by a preponderance of the evidence that the conduct occurred, even if that conduct formed the basis of a criminal charge on which a jury acquitted the defendant." *United States v. Szczerba*, 897 F.3d 929, 942 (8th Cir. 2018) (citation and quotations omitted).  Thus, a judge sentencing Logan today could apply the exact same cross-reference to the murder guideline—and calculate the exact same guidelines range—without running afoul of *Apprendi* and *Booker*.  And although the judge would now have discretion to vary below the guidelines range, the judge would not be required to do so.

As a result, Logan is just speculating about what sentence Judge Rosenbaum would have imposed in the absence of the mandatory guidelines.  Logan committed a horrific crime, took the stand at his trial and perjured himself, and showed absolutely no remorse for the harm that he caused.  But for the statutory maximum, Logan's guidelines range would have been life in prison, and the government made clear at sentencing that it would have sought a life sentence.  ECF No. 331 at 32 ("[Logan] deserves to be locked up for the rest of his life.  Unfortunately, . . . the statutory maximum penalty is only 45 years.").  At Logan's sentencing, Judge Rosenbaum did not in any way indicate that he thought that 540 months was an excessive sentence.  Had he not been constrained by the statutory maximum, Judge Rosenbaum may have concluded that Logan deserved a sentence *longer* than 540 months.  For these reasons,

(continued...)

-24-

guidelines range and therefore his sentence would be much lower today.  Second,

because the guidelines were mandatory and produced a range above the statutory

maximum, Judge Rosenbaum had no choice but to give Logan the statutory maximum

(540 months) and no ability to consider mitigating factors such as Logan's youth.

The government responds that Logan is impermissibly using § 3582 to challenge

the validity of his sentence.  Although his first pro se motion for compassionate release

argued that his sentence is illegal based on *Apprendi* and *Booker*, *see* ECF No. 415 at 1–3,

Logan says that his second motion is different, because it frames the legal changes

brought by these cases as factors contributing to an extraordinary and compelling

reason warranting his release—rather than as factors making his sentencing illegal.

Logan's argument as to *Apprendi* and *Booker* is a wolf in sheep's clothing.  His

supplemental briefs may not use the words "illegal" or "invalid," but he is in effect

using a compassionate-release motion to bring yet another challenge to the validity of

his sentence.  At its core, Logan's argument is that what is extraordinary about his

situation is that he is serving an illegal sentence.  In *Fine*, the Eighth Circuit instructed

---

[10](...continued)
Logan's argument as to what sentence he might have received in 1998 if the guidelines
had been advisory must be taken with a substantial grain of salt.  *Cf. Saleh*, 2020 WL
3839626, at *4 (rejecting argument in § 3582 motion that advisory guidelines would
result in a lower sentence when the defendant was sentenced by a different judge, and
although the court "would not be *obligated*" to sentence defendant in the same manner
as it did under the mandatory guidelines, it would still be able to do so today).

that "a post-judgment motion that fits the description of a motion to vacate, set aside, or correct a sentence should be treated as a § 2255 motion."  982 F.3d at 1118.  Logan has already filed a § 2255 motion, and he has twice sought and been denied permission to bring a second or successive § 2255 motion to raise exactly the challenges to his sentence that he raises in his compassionate-release motion.  Thus, to the extent that his *Apprendi* and *Booker* argument challenges the validity of his sentence, his argument is "an unauthorized successive motion to vacate, set aside, or correct a sentence."  *Id.* at 1119.

Setting that aside, the Court does not agree that the changes in the law created by *Apprendi* and *Booker* constitute extraordinary and compelling reasons warranting Logan's release.  As the Court explained above, there is a complex body of statutory and common law about the extent to which a defendant who has already been sentenced can take advantage of changes to the law that occur after he is sentenced.  The Eighth Circuit has held that *Apprendi* and *Booker* are not retroactively applicable.  *See Never Misses A Shot v. United States*, 413 F.3d 781, 783 (8th Cir. 2005) (holding *Booker* does not apply retroactively); *United States v. Moss*, 252 F.3d 993, 997 (8th Cir. 2001) (holding *Apprendi* does not apply retroactively).  The Court does not believe that Logan should be able to use a compassionate-release request to make an "end-run around" the Eighth Circuit's holdings.[11]  *Cf. United States v. Fox*, No. 2:14-cr-03-DBH, 2019 WL

---

[11]This is not to say that there are *no* circumstances in which a non-retroactive

(continued...)

3046086, at *3 (D. Me. July 11, 2019) (discussing non-retroactive decisions of the

Sentencing Commission and Congress).

Logan argues to the contrary, citing the Fourth Circuit's decision in *McCoy* in

support. *McCoy* considered Congress's decision to end the "stacking" of sentences for

violations of 18 U.S.C. § 924(c).[12] *McCoy* held that, notwithstanding Congress's decision

that the change to § 924(c) should *not* apply retroactively, a district court could

nonetheless use the vehicle of a compassionate-release request to give a prisoner the

benefit of the change.

---

[11](...continued)
change in sentencing law—when taken with other salient factors—would be
extraordinary and compelling.

[12]As the Fourth Circuit explained:

> Prior to the First Step Act, a conviction was treated as "second or
> subsequent," triggering the 25-year minimum sentence, even if the first
> § 924(c) conviction was obtained in the same case. *See Deal v. United
> States*, 508 U.S. 129, 132 (1993). The First Step Act ended this practice,
> known as sentence "stacking," by clarifying that the 25-year mandatory
> minimum applies only when a prior § 924(c) conviction arises from a
> separate case and already "has become final." § 403(a), 132 Stat. at 5222.
> Under § 403 of the First Step Act, that is, the 25-year mandatory minimum
> is "reserved for recidivist offenders, and no longer applies to multiple §
> 924(c) convictions obtained in a single prosecution." *United States v.
> Jordan*, 952 F.3d 160, 171 (4th Cir. 2020).

*McCoy*, 981 F.3d at 275.

This Court does not disagree with the Fourth Circuit's holding that a district court has the discretion to find that "the severity of a § 924(c) sentence, combined with the enormous disparity between that sentence and the sentence a defendant would receive today, . . . constitute[s] an 'extraordinary and compelling' reason for relief under § 3582(c)(1)(A)." *McCoy*, 981 F.3d at 285. The Court also notes two points that the Fourth Circuit emphasized: First, the Fourth Circuit stressed that the change that Congress made to § 924(c) was "not just any sentencing change, but an exceptionally dramatic one," citing the "sheer and unusual length of the sentences" imposed under the former version of § 924(c) and "the 'gross disparity' between those sentences and the sentences Congress now believes to be an appropriate penalty for the defendants' conduct." *Id.* The Fourth Circuit explained that three of the appellees who had received 45-year mandatory-minimum sentences under the former version of § 924(c) would receive 15-year sentences under the amended version—a difference of 30 years. Second, the Fourth Circuit explained that "in granting compassionate release, the district courts relied not only on the defendants' § 924(c) sentences but on full consideration of the defendants' individual circumstances." *Id.* at 286. For example, three of the appellees had little or no criminal records, participated in just one attempted and two completed bank robberies, and did not injure (much less kill) any person. Moreover, at the time that those three appellees were sentenced, the trial court

"expressed its concern about the severity of the sentences produced by the stacked § 924(c) charges but explained that it had no discretion in the matter." *Id.* at 278.

Logan's case is much different than the cases of the appellees in *McCoy*. *McCoy* cited "exceptionally dramatic" changes that Congress had made to the mandatory minimum sentences for a particular crime. By contrast, the judicial decisions cited by Logan—*Apprendi* and *Booker*—did not change any sentence for any crime, but instead changed the process by which sentences are imposed. The non-retroactive changes that resulted from *Apprendi* and *Booker* were procedural (not substantive), applied throughout the criminal-justice system (not just to one crime), and would not necessarily have resulted in a shorter guidelines range (much less a shorter sentence) for any defendant who was sentenced before the decisions were issued.

Moreover, the facts of Logan's case are much worse than the facts of *McCoy*. Logan committed many more crimes and his crimes were much more serious; whereas the *McCoy* appellees did not harm a person, Logan's crimes directly resulted in the deaths of two persons and may very well have resulted in the deaths of others. It is notable that unlike one of the sentencing judges in *McCoy*, Judge Rosenbaum—a fierce critic of the mandatory sentencing guidelines—never expressed the slightest reservation about the length of the sentence that he imposed on Logan.

Finally, Logan points out that recent sentences for robbery and murder are, on average, much shorter than his 540-month sentence.  *See* ECF No. 426 at 18–19.  Without doubt, Logan is serving a longer-than-average sentence,[13] but he committed a more-serious-than-average crime.  Indeed, Logan committed a *string* of serious crimes—and the circumstances surrounding one of those crimes (the robbery of the gun shop) were particularly egregious.  As the prosecutor explained at Logan's sentencing, "Logan planned the crime, stalked his victims, carried out the crime, bragged about having committed the crime, and then later repeatedly lied about the circumstances of the crime."  ECF No. 331 at 11.  Thus, comparing Logan's sentence to the average sentence

―――――――――

[13]Logan cites various cases in which a court identified an unusually long sentence as a reason for granting compassionate release.  ECF No. 426 at 20–21 & nn.13–14.  But these cases either relied on a number of factors in addition to the long sentence or considered situations in which Congress shortened the mandatory minimum, neither of which is present here.  *See United States v. Anderson*, No. 99-229(1) ADM/AJB, 2020 WL 6705694 (D. Minn. Nov. 13, 2020) (granting release based on serious health conditions, and mentioning mandatory guidelines only when weighing the § 3553(a) factors); *United States v. Vasquez-Lujano*, No. 1:95-cr-00045-BLW, 2020 WL 6384722 (D. Idaho Oct. 29, 2020) (considering age, medical conditions, and the fact of a life sentence under mandatory guidelines); *United States v. Price*, No. 07-0152-06 (ESH), 2020 WL 5909789 (D.D.C. Oct. 6, 2020) (considering reduction in statutory mandatory minimum from life to 15 years, sentencing disparities between the defendant and co-conspirators, and health concerns); *United States v. Day*, 474 F. Supp. 3d 790, 806–07 (E.D. Va. 2020) (noting mandatory minimum changed from life to 15 years); *Vigneau*, 473 F. Supp. 3d at 36–39 (considering long sentence, changing societal views about marijuana, and rare conviction for a continuing criminal enterprise); *United States v. Millan*, No. 91-CR-685 (LAP), 2020 WL 1674058, at *15 (S.D.N.Y. Apr. 6, 2020) (considering "extraordinary rehabilitation" and sentencing disparities); *United States v. Cantu-Rivera*, No. H-89-204, 2019 WL 2578272 (S.D. Tex. June 24, 2019) (weighing age, rehabilitation, and elimination of mandatory life sentence).

received by someone who commits a single murder or a single robbery without similar

aggravating circumstances is not terribly helpful.[14]  Logan has not identified defendants

"who have been found guilty of *similar conduct*" and who received materially shorter

prison sentences.  18 U.S.C. § 3553(a)(6) (emphasis added).

In sum, although the Court recognizes that it has discretion to grant Logan's

compassionate-release request based on his extrinsic legal arguments, the Court has

decided not to do so.  Given the quasi-habeas nature of Logan's claims, the nature of the

legal changes to which he points, and the fact that *Apprendi* and *Booker* are not

retroactive, the Court finds that the extrinsic legal factors that Logan identifies—even

when considered with his other arguments—do not provide an extraordinary and

compelling reason for his release.  *See United States v. Fuqua*, No. 1:15-cr-00080-JMS-

DML, 2020 WL 5423919, at *3 (S.D. Ind. Sept. 10, 2020) (noting "the possibility" of a

shorter sentence if the defendant was sentenced today was not extraordinary and

compelling because the legal change at issue was not retroactive); *United States v. Avery*,

No. 2:07-cr–20040-2, 2020 WL 3167579, at *7 (W.D. Tenn. June 9, 2020) ("Although the

---

[14]Logan argues that his charges "stemmed basically from the armed robbery on June 22–23, 1992, and the activity in the next few days transporting the guns for sale in Chicago."  ECF No. 426 at 15.  That is not accurate.  Count 33 charged Logan with unlicensed dealing in approximately 223 firearms, covering a months-long period from November 10, 1991 to June 25, 1992.  PSR ¶ 8.  Indeed, the PSR states that "Logan was present during many of the illegal firearm purchases orchestrated by Hardaway and Roan and the illegal sales of the firearms in Chicago."  PSR ¶ 16.  Clearly, then, Logan's participation in the conspiracy was not limited to the gun-shop robbery.

Court has the discretion to consider that [the defendant] might receive a lower sentence today [due to the elimination of stacking], that fact, alone, is not sufficiently extraordinary and compelling to grant relief.").

### 2.  Extrinsic Factual Factors: Rehabilitation

Logan also argues that his rehabilitation supports his release.  Without question, Logan has done well in prison.  Logan has maintained a "spotless" disciplinary record, paid off his restitution, worked for UNICOR for 19 years, completed educational programming, and stayed close to his family.  *See* ECF No. 426 at 25–27 & Exs. B–F.  The Court commends Logan for his commitment to improving his life.  As the Court has explained, however, it does not believe that this type of rehabilitation should be afforded significant weight in light of § 994(t) and in light of the fact that rehabilitation is supposed to be the rule, not the exception.  *See Fine*, 982 F.3d at 1119; *Williams*, 2020 WL 614807, at *1–2.

### 3.  Intrinsic Factors

Logan also relies on several intrinsic factors, such as his age at the time of his offense and his lack of any prior criminal history.  The Court has already explained why it believes that intrinsic factors should generally be given little weight when a judge decides whether to grant a compassionate-release request—particularly when, as here, a

different judge (one who was far more familiar with the defendant and the case) imposed the sentence.

The Court recognizes that Logan was sentenced when the Sentencing Guidelines were mandatory and that, because his guidelines range was above his statutory maximum, Judge Rosenbaum was required to sentence Logan to the statutory maximum.  In other words, Logan is not simply disagreeing with how Judge Rosenbaum weighed the § 3553(a) factors; he is pointing out that Judge Rosenbaum had no ability to weigh the § 3553(a) factors.

Because this argument gave this Court pause, the Court retrieved the transcript of Logan's 1998 sentencing hearing from the National Archives and read every word. A couple of things about Logan's sentencing hearing were notable.  First, the government pointed out that, but for the statutory maximum, the Sentencing Guidelines would have called for a life sentence, and the government made clear that, in its view, Logan deserved a life sentence.  ECF No. 331 at 32.  Second, Logan continued to deny that he had done anything wrong and expressed no remorse whatsoever for his crimes.  *Id.* at 27.  And third, Judge Rosenbaum never expressed the slightest reservation about the sentence that he imposed.

Early in the hearing, Judge Rosenbaum noted that he agreed with the jury's verdict (*id.* at 16) and that Logan had "clearly" perjured himself at trial (*id.* at 19).

Toward the end of the hearing, when Judge Rosenbaum finally addressed Logan

directly, he began his remarks as follows:

> Mr. Logan, you have denied that you are guilty of this crime,
> but I tell you that you are.  You know you are.  Every person
> who heard the evidence knows that you are.

*Id.* at 32.  Judge Rosenbaum went on to lament that the victims of Logan's crime

extended beyond the two men that Logan and his coconspirator left dead in the gun

shop and included all of those shot with the hundreds of guns that Logan helped to put

on the street:

> [T]here are future crimes and present crimes still being
> committed with those guns that are wandering around on
> the streets of Chicago and other places . . . .  And every week
> and every day you can read reports of young people being
> shot and killed, and that blow keeps falling like a hammer
> over and over and over.  And each new day that one of those
> guns is used by another person to cause injury, another set
> of pains occurs.

*Id.* at 33–34.  Finally, alluding to the fact that Logan had a supportive family and a

privileged upbringing (his father was a judge), Judge Rosenbaum said:  "Sir, I have seen

100 defendants without a tenth as much support as you had in your life and somehow

[you] went horribly, horribly wrong."  *Id.* at 38.

Based on its own review of the record, this Court cannot find a clear "mismatch"

between the crimes that Logan committed and the sentence that he received.  Logan

undoubtedly received a very long sentence, but Logan also committed a long series of

terrible crimes—crimes that definitely resulted in the deaths of two people and likely

resulted in the deaths of others.  Moreover, as best as the Court can tell, Logan has

never taken any responsibility for his crimes.

This is not an easy case.  Logan was very young when he committed his crimes,

he received a very long sentence, and he has been a model prisoner.  But ultimately the

Court concludes that, even when all of the arguments that Logan makes are considered

collectively, Logan has not met the "exceptionally high standard for relief" set by

§ 3582(c)(1)(A)(i).[15]  *McCoy*, 981 F.3d at 288.  Logan's second motion for compassionate

release is therefore denied.[16]

ORDER

_____

[15]Because Logan has not presented an extraordinary and compelling reason
warranting his release, the Court need not consider Logan's arguments that he is not a
danger to the public and that the § 3553(a) factors support his release.

[16]Logan's pro se filing mentions that his facility (FCI Elkton) has done a poor job
handling COVID-19.  ECF No. 420 at 9.  Logan has not identified any medical condition
placing him at greater risk of serious illness from the coronavirus, and the PSR states
that he has none.  PSR ¶ 54.  As a result, Logan's concern about the spread of COVID-19
"applies to literally every person who is now incarcerated" at FCI Elkton and provides
no basis for his release.  *United States v. Doss*, No. 15-CR-0106(4) (PJS/SER), 2020 WL
6503404, at *1 (D. Minn. Nov. 5, 2020).  Moreover, as of the date of this order, FCI Elkton
is reporting that only one of its inmates has an active COVID-19 infection and that 266
inmates have been fully vaccinated.  *See* Federal Bureau of Prisons, *COVID-19
Coronavirus*, https://www.bop.gov/coronavirus (last visited April 1, 2021).

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT defendant's second motion for release [ECF No. 420] is

DENIED.

Dated: April 1, 2021                     s/Patrick J. Schiltz
                                         Patrick J. Schiltz
                                         United States District Judge